1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

CRISTIAN CAISA TELENCHANA, *et al.*,

Petitioners,

v.

LAURA HERMOSILLO, *et al.*,

Respondents.

CASE NO. 2:26-cv-00363-GJL

ORDER GRANTING IN PART
PETITION FOR WRIT OF HABEAS
CORPUS

Petitioners Cristian Caisa Telenchana, Kelvin Delgado-Pacheco, Cherif Diallo, Keismer Dorante-Freitez, Jose Espina Espina, Jesus Guardiola Molina, Isidro Lamus Franco, Luis Lopez Lopez, Moustapha Mbareck, Raquel Melean-Faneite, Victor Mendez Molina, and Fares Soliman (collectively "Petitioners") are currently detained by U.S. Immigration and Customs Enforcement ("ICE") at the Northwest ICE Processing Center ("NWIPC") in Tacoma, Washington. Dkt. 1. On January 30, 2026, Petitioners, through counsel, filed a Petition for writ of habeas corpus under 28 U.S.C. § 2241, seeking immediate release from immigration detention and injunctive relief. *Id.*

Respondents to the Petition include Laura Hermosillo (Acting Field Office Director for ICE's Seattle Field Office), Bruce Scott (Warden of the NWIPC), U.S. Department of Homeland

Security ("DHS"), Kristi Noem (DHS Secretary), and Pamela Bondi (U.S. Attorney General) (collectively "Respondents"). The Petition has been fully briefed. Dkts. 1, 19, 34. The parties have consented to proceed in this matter before a United States Magistrate Judge. Dkt. 16.

Having considered the parties' submissions, the balance of the record, and the governing law, the Court **GRANTS** the Petition and **ORDERS** (1) the immediate release of Petitioners Caisa Telenchana, Delgado-Pacheco, Diallo, Dorante-Freitez, Espina Espina, Lamus Franco, Lopez Lopez, Mbareck, Melean-Faneite, Mendez Molina, and Soliman, (2) the conditional release of Petitioner Guardiola Molina, and (3) injunctive relief as outlined in the conclusion.

## I.        FACTUAL BACKGROUND

The particular facts for each Petitioner are addressed below.[1] The undisputed facts common to all Petitioners are these: Petitioners, who are noncitizens, were previously detained and released from immigration custody—several Petitioners were released on their own recognizance ("OREC"), a few were placed on interim humanitarian parole, and one was an unaccompanied minor released to the care of a United States-citizen family member by the Office of Refugee Resettlement ("ORR"). *See* Dkt. 1; Dkt. 19. After living months or years in the United States, Petitioners were re-detained by immigration officials without notice or an opportunity to be heard on the reasons for their re-detention. *See* Dkt. 1; Dkt. 19.

//

//

---

[1] At the outset, the Court notes that Respondents' briefing contains at least one misrepresentation and/or unexplained inconsistency within the factual record. *See infra* Footnote 2. Such oversights appear to be related to Respondents' acknowledgment that, "due to the number of petitioners, undersigned counsel was unable to review each of the relevant immigration files prior to the return deadline." Dkt. 19 at 4 n.2. While the Court appreciates the administrative burden presented by multi-petitioner litigation, Respondents remain beholden to their solemn obligation to ensure that their factual representations to the Court are accurate and adequately supported by the record.

ORDER GRANTING IN PART PETITION FOR
WRIT OF HABEAS CORPUS - 2

**A.      Petitioners Released on Recognizance ("OREC Group")**

      1.      Petitioner Cristian Caisa Telenchana

Petitioner Caisa Telenchana, a citizen of Ecuador, entered the United States with his family on May 7, 2024. Dkt. 1 at ¶ 32; Dkt. 3 (Caisa Telenchana Declaration); Dkt. 20 (Dumo Declaration). Petitioner Telenchana was apprehended by United States Border Patrol ("USBP") and charged as inadmissible under Section 212(a)(6)(A)(i) of the Immigration and Nationality Act ("INA"). Dkt. 2-1 at 3 (Notice to Appear); Dkt. 3 (Caisa Telenchana Declaration); Dkt. 20 (Dumo Declaration). Petitioner Caisa Telenchana was then released by USBP with instructions to appear before an immigration court in Minneapolis, Minnesota. Dkt. 1 at ¶ 32; Dkt. 3 (Caisa Telenchana Declaration); Dkt. 20 (Dumo Declaration).

On or around November 21, 2025, Petitioner Caisa Telenchana was re-detained by ICE and subsequently transferred to NWIPC. Dkt. 1 at ¶¶ 38–39; Dkt. 2-1 (Record of Deportable/Inadmissible Alien); Dkt. 3 (Caisa Telenchana Declaration); Dkt. 20 (Dumo Declaration). The record reflects that Petitioner Caisa Telenchana received no written notice of the basis for his re-detention and no individualized custody determination. Dkt. 1 at ¶¶ 41–43; Dkt. 3 (Caisa Telenchana Declaration). Instead, Petitioner Caisa Telenchana states that, at the most recent ICE check-in before his re-detention, he was advised that he was "in compliance with everything." Dkt. 1 at ¶ 39; Dkt. 3 (Caisa Telenchana Declaration).

      2.      Petitioner Kelvin Delgado-Pacheco

Petitioner Delgado-Pacheco, a citizen of Venezuela, entered the United States in September 2023 without lawful status. Dkt. 1 at ¶ 44; Dkt. 4 (Delgado-Pacheco Declaration); Dkt. 21 (Benjamin Declaration). Petitioner Delgado-Pacheco was apprehended by USBP and charged as inadmissible under Section 212(a)(6)(A)(i) of the INA. Dkt. 1 ¶ 44; Dkt. 2-3 (Notice to Appear); Dkt. 4 (Delgado-Pacheco Declaration); Dkt. 21 (Benjamin Declaration). Shortly

thereafter, Petitioner Delgado-Pacheco was released by USBP. Dkt. 1 at ¶ 44; Dkt. 4 (Delgado-Pacheco Declaration); Dkt. 21 (Benjamin Declaration). He reported to the ICE Office in Portland, Oregon, shortly after arriving in the city with his family and filed a timely application for asylum in July 2024. Dkt. 1 at ¶¶ 45, 46; Dkt. 4 (Delgado-Pacheco Declaration); Dkt. 21 (Benjamin Declaration).

On December 17, 2025, Petitioner Delgado-Pacheco was re-detained by ICE and transferred to NWIPC. Dkt. 1 at ¶¶ 47–48; Dkt. 4 (Delgado-Pacheco Declaration); Dkt. 21 (Benjamin Declaration). He did not receive written notice or a custody hearing prior to re-detention. Dkt. 1 at ¶¶ 49–51; Dkt. 4 (Delgado-Pacheco Declaration).

3.    Petitioner Cherif Diallo

Petitioner Diallo, a citizen of Guinea, entered the United States on November 19, 2023, without lawful status. Dkt. 1 at ¶ 52; Dkt. 5 (Diallo Declaration); Dkt. 23 (Baz Declaration). Following apprehension by USBP, Petitioner Diallo was charged as inadmissible under Section 212(a)(6)(A)(i) of the INA. Dkt. 1 at ¶ 52; Dkt. 2-5 (Notice to Appear). Following his release by USBP, Petitioner Diallo reported to the ICE Office in Portland, Oregon. Dkt. 1 at ¶ 52; Dkt. 5 (Diallo Declaration); Dkt. 23 (Baz Declaration).

Petitioner Diallo was re-detained at the Portland ICE Office on August 6, 2025. Dkt. 1 at ¶¶ 57–58; Dkt. 5 (Diallo Declaration); Dkt. 23 (Baz Declaration). Petitioner Diallo remains detained at NWIPC without prior notice or a hearing regarding the reasons for his re-detention. Dkt. 1 ¶¶ 1, 60–62.

4.    Petitioner Jose Espina Espina

Petitioner Espina Espina, a citizen of Venezuela, arrived in the United States with his family on May 2, 2023. Dkt. 1 at ¶ 71; Dkt. 7 (Espina Espina Declaration); Dkt. 26 (Hubbard Declaration). Upon arrival, Petitioner Espina Espina was apprehended by USBP and released

1    shortly thereafter. Dkt. 1 at ¶ 71; Dkt. 2-10 (OREC). Petitioner's Notice to Appear, dated May 7,

2    2023, charges him as inadmissible under Section 212(a)(6)(A)(i) of the INA. Dkt. 2-11 (Notice

3    to Appear). While released, Petitioner obtained temporary protected status and filed a timely

4    application for asylum, which remains pending. Dkt. 1 at ¶ 74; Dkt. 7 (Espina Espina

5    Declaration); Dkt. 26 (Hubbard Declaration).

6          On December 28, 2025, Petitioner Espina Espina was re-detained by ICE and transferred

7    to NWIPC. Dkt. 1 at ¶¶ 1, 76; Dkt. 7 (Espina Espina Declaration); Dkt. 26 (Hubbard

8    Declaration). Petitioner Espina Espina remains detained at NWIPC without prior notice or a

9    hearing regarding the reasons for his re-detention. Dkt. 1 at ¶¶ 78–80.

10          5.    Petitioner Moustapha Mbareck

11          Petitioner Mbareck, a citizen of Mauritania, entered the United States without lawful

12    status on August 27, 2023. Dkt. 1 at ¶ 110; Dkt. 11 (Mbareck Declaration); Dkt. 22 (Baz

13    Declaration). Shortly thereafter, Petitioner Mbareck was released by USBP and his Notice to

14    Appear, which is dated August 30, 2023, charges him as inadmissible under Section

15    212(a)(6)(A)(i) of the INA. Dkt. 2-19.

16          On December 29, 2025, Petitioner Mbareck was re-detained by ICE and eventually

17    transferred to NWIPC. Dkt. 1 at ¶¶ 110–13; Dkt. 11 (Mbareck Declaration); Dkt. 22 (Baz

18    Declaration). Petitioner remains detained at NWIPC without prior notice or a hearing regarding

19    the reasons for his re-detention. Dkt. 1 at ¶¶ 114–16.

20          6.    Petitioner Raquel Melean-Faneite

21          Petitioner Melean-Faneite, a citizen of Venezuela, entered the United States with her son

22    on June 22, 2023. Dkt. 1 at ¶ 117; Dkt. 12 (Melean-Faneite Declaration); Dkt. 25 (Soraghan

23    Declaration). Petitioner Melean-Faneite was then released by USBP and her Notice to Appear,

24    which was dated June 24, 2023, charged her as inadmissible under Section 212(a)(6)(A)(i) of the

INA. Dkt. 2-21. While released, Petitioner married a United States citizen, received a work

permit, obtained temporary protected status, and filed a timely application for asylum, which

remains pending. Dkt. 1 at ¶¶ 119–20; Dkt. 12 (Melean-Faneite Declaration); Dkt. 25 (Soraghan

Declaration).

On October 21, 2025, Petitioner Melean-Faneite presented to an ICE Office seeking

paperwork to obtain a REAL ID from state authorities. Dkt. 1 at ¶¶ 120–21; Dkt. 12 (Melean-

Faneite Declaration); Dkt. 25 (Soraghan Declaration). She was then re-detained by ICE and

transferred to NWIPC, where she remains detained without prior notice and the opportunity to be

heard on the reasons for her re-detention. Dkt. 1 ¶¶ 121–25; Dkt. 12 (Melean-Faneite

Declaration); Dkt. 25 (Soraghan Declaration).

7.    Petitioner Isidro Lamus Franco

Petitioner Lamus Franco, a citizen of Colombia, entered the United States without lawful

status on February 10, 2024. Dkt. 1 at ¶ 89; Dkt. 9 (Lamus Franco Declaration); Dkt. 24

(Hubbard Declaration). That same day, Petitioner Lamus Franco was released by USBP and

charged as inadmissible under Section 212(a)(6)(A)(i) of the INA. Dkt. 1 at ¶ 89; Dkt. 9 (Lamus

Franco Declaration); Dkt. 24 (Hubbard Declaration). While released, Petitioner filed an

application for asylum, found employment, and enrolled his son in school. Dkt. 1 at ¶¶ 89, 93;

Dkt. 9 (Lamus Franco Declaration); Dkt. 24 (Hubbard Declaration).

Petitioner Lamus Franco was re-detained by ICE on December 28, 2025, and transferred

to NWIPC. Dkt. 1 at ¶¶ 95–99; Dkt. 9 (Lamus Franco Declaration); Dkt. 24 (Hubbard

Declaration). Petitioner Lamus Franco did not receive prior notice of his re-detention or a

hearing. Dkt. 1 at ¶¶ 97–99; Dkt. 9 (Lamus Franco Declaration); Dkt. 24 (Hubbard Declaration).

8.  <u>Petitioner Keismer Dorante-Freitez</u>[2]

Petitioner Dorante-Freitez, a citizen of Venezuela, entered the United States on March 8,

2024, pursuant to a "CBP One" appointment. Dkt. 1 at ⁋ 63; Dkt. 6 (Dorante-Freitez

Declaration); Dkt. 27 (Benjamin Declaration). In his Notice to Appear, dated March 8, 2024,

Petitioner was deemed an "arriving alien" and "immigrant not in possession of a valid unexpired

immigrant visa, reentry permit, border crossing card, or other valid entry document required by

the [INA]." Dkt. 2-7. Upon his release, Petitioner Dorante-Freitez was scheduled to appear in

immigration court in Chicago, Illinois. Dkt. 1 at ⁋ 63; Dkt. 2-7; Dkt. 6 (Dorante-Freitez

Declaration); Dkt. 27 (Benjamin Declaration). While released, Petitioner applied for asylum,

withholding of removal, and protection under the Convention Against Torture. Dkt. 1 at ⁋ 65;

Dkt. 2-7; Dkt. 6 (Dorante-Freitez Declaration); Dkt. 27 (Benjamin Declaration).

Petitioner Dorante-Freitez was re-detained on December 11, 2025, during the course of a

traffic stop for a broken taillight. Dkt. 1 at ⁋⁋ 66–67; Dkt. 6 (Dorante-Freitez Declaration); Dkt.

27 (Benjamin Declaration). Petitioner was subsequently transferred to NWIPC, where he

remains detained. Dkt. 1 at ⁋⁋ 1, 67; Dkt. 6 (Dorante-Freitez Declaration); Dkt. 27 (Benjamin

Declaration). It is undisputed that Petitioner did not receive written notice of the reasons for his

re-detention or a hearing. Dkt. 1 at ⁋⁋ 68–70; Dkt. 6 (Dorante-Freitez Declaration); Dkt. 27

(Benjamin Declaration). Respondents contend, contrary to Petitioner's allegations, that arresting

USBP officers "considered the facts and circumstances" of Petitioner Dorante-Freitez's case and,

on those unspecified grounds, "determined that he was a flight risk and danger to the

---

[2] In their Return and supporting Declaration, Respondents identify Petitioner Dorante-Freitez as an individual released on temporary humanitarian parole. Dkt. 19 at 6–7; Dkt. 27 at ⁋ 5. However, Petitioner Dorante-Freitez's Notice to Appear, dated December 11, 2025, states that he "was previously released on an Order of Release on Recognizance," not humanitarian parole. Dkt. 2-8 at 7. Respondents do not explain this inconsistency between their position and the factual record. The Court therefore treats Petitioner Dorante-Freitez as a member of the OREC Group for purposes of this Order.

1  community." Dkt. 27 at 2 (Benjamin Declaration). Respondents also contend that Petitioner was

2  offered and declined an "informal interview" following his re-arrest. *Id.*

3  **B.      Petitioners Released on Humanitarian Parole ("Parole Group")**

4       1.      Petitioner Jesus Guardiola Molina

5       Petitioner Guardiola Molina, a citizen of Mexico, entered the United States with his

6  family on October 4, 2024, pursuant to a "CBP One" appointment. Dkt. 1 at ¶ 81; Dkt. 8

7  (Guardiola Molina Declaration); Dkt. 31 (Soraghan Declaration). In his Notice to Appear, dated

8  October 4, 2024, Petitioner Guardiola Molina was deemed an "arriving alien" and "immigrant

9  not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or

10  other valid entry document required by the [INA]." Dkt. 2-13. Petitioner Guardiola Molina was

11  then paroled in the United States with a parole expiration date of October 3, 2026.[3] Dkt. 2-12 (I-

12  94 Results).

13       On December 12, 2025, ICE officers arrived at Petitioner Guardiola Molina's residence,

14  stating they were there to both confirm his residence and to place an ankle monitor on him. Dkt.

15  1 at ¶ 84; Dkt. 8 (Guardiola Molina Declaration); Dkt. 31 (Soraghan Declaration). While

16  Petitioner stated his attorney was on the way, ICE officers refused to wait and directed Petitioner

17  to report to the nearest ICE office on the following Monday, rather than on his previously

18  scheduled appointment. Dkt. 1 at ¶ 84; Dkt. 8 (Guardiola Molina Declaration); Dkt. 31

19  (Soraghan Declaration). Upon the advice of his attorney, Petitioner presented to an ICE office on

20  the date of his previously scheduled appointment—January 20, 2026. Dkt. 1 at ¶ 85; Dkt. 8

21

22  _____
[3] Despite supporting documentation filed alongside the Petition, Respondents state it is "unclear" when Petitioner
23  Guardiola Molina's humanitarian parole was scheduled to expire. Dkt. 19 at 7–8; *see also* Dkt. 2-12 (I-94 Results).
Respondents do not address why the documentation submitted by Petitioners is insufficient to establish the
expiration date for Petitioner Guardiola Molina's parole. As such, the Court assumes Petitioners' documentation is
24  accurate and accepts the expiration date reflected therein.

(Guardiola Molina Declaration). That day, Petitioner was re-detained by ICE officers and transferred to NWIPC. Dkt. 1 at ¶ 85; Dkt. 8 (Guardiola Molina Declaration); Dkt. 31(Soraghan Declaration).

It is undisputed that Petitioner Guardiola Molina did not receive prior written notice of the reasons for his re-detention or a hearing. Dkt. 1 at ¶¶ 86, 88. There is, however, a dispute as to whether ICE performed an individualized assessment of Petitioner's risk of flight or dangerousness. *Compare* Dkt. 1 at ¶ 87 (alleging "ICE did not assess whether he presented a flight risk or danger to the community") *with* Dkt. 31 at 2 (Soraghan Declaration, stating "DHS and partner agencies have acquired information indicating that Petitioner may be a sicario—hitman—for the Jalisco New Generation Cartel ("CJNG"). Accordingly, the decision was made to take Petitioner into ICE custody due to the significant danger to the community that he poses.").

### 2.    Petitioner Victor Mendez Molina

Petitioner Mendez Molina, a citizen of Venezuela, entered the United States with his family on July 25, 2024, pursuant to a "CBP One" appointment. Dkt. 1 at ¶ 126; Dkt. 13 (Mendez Molina Declaration); Dkt. 28 (Bloom Declaration). His Notice to Appear, dated July 25, 2024, charged Petitioner Mendez Molina as inadmissible under Section 212(a)(7)(A)(i)(II) of the INA. Dkt. 2-22. Petitioner expressed fear of returning to Venezuela and was paroled into the United States. Dkt. 1 at ¶ 126; Dkt. 13 (Mendez Molina Declaration); Dkt. 28 (Bloom Declaration). While released, Petitioner filed a timely asylum application and found employment. Dkt. 1 at ¶ 129; Dkt. 13 (Mendez Molina Declaration); Dkt. 28 (Bloom Declaration). Petitioner's asylum case was consolidated with that of his partner and remains pending. Dkt. 1 at ¶ 129; Dkt. 13 (Mendez Molina Declaration).

According to Respondents, Petitioner Mendez Molina's parole was "revoked or expired" on April 18, 2025. Dkt. 28 (Bloom Declaration). He was not re-detained at that time. Instead, Petitioner Mendez Molina was re-detained on January 12, 2026, during an ICE check-in. Dkt. 1 at ¶ 132; Dkt. 13 (Mendez Molina Declaration); Dkt. 28 (Bloom Declaration). It is undisputed that Petitioner Mendez Molina did not receive prior written notice of the reasons for his re-detention or a hearing. Dkt. 1 at ¶¶ 134, 136. Although Respondents note that immigration officials learned Petitioner Mendez Molina incurred a violation for driving with a suspended license ahead of his re-detention, there is no allegation or evidence that this violation led immigration officials to determine he posed a risk of flight or danger to the community. *See* Dkt. 28 (Bloom Declaration). Indeed, it is undisputed that ICE did not assess whether Petitioner Mendez Molina was a flight risk or a danger to the community ahead of his re-detention. Dkt. 1 at ¶ 135.

    3.    Petitioner Fares Soliman

Petitioner Soliman, a citizen of Egypt, entered the United States without lawful status on June 19, 2023. Dkt. 1 at ¶ 143; Dkt. 2-26 (First Notice to Appear); Dkt. 14 (Soliman Declaration); Dkt. 29 (Rosa Declaration). Petitioner was initially placed into expedited removal proceedings, but his expedited removal was canceled following a successful credible fear interview with the United States Citizenship and Immigration Services. Dkt. 1 at ¶ 143; Dkt. 14 (Soliman Declaration); Dkt. 29 (Rosa Declaration). Petitioner was charged as inadmissible under INA § 212(a)(6)(A)(i), scheduled for immigration court proceedings in California, and paroled into the United States with a parole expiration date of July 18, 2024. Dkt. 2-27 (Second Notice to Appear). Dkt. 29 (Rosa Declaration). While on parole, Petitioner filed a timely application for asylum and obtained a work permit. Dkt. 1 at ¶ 138; Dkt. 14 (Soliman Declaration).

1    Petitioner Soliman was re-detained outside of his place of employment on December 16,

2    2025. Dkt. 1 at ¶ 143. Respondents assert that Petitioner Soliman "violated the terms and

3    conditions of his release by missing biometrics check-ins," but the Respondents' supporting

4    documentation lack any allegation or evidence that these violations were the reason for his re-

5    detention. *See* Dkt. 29 (Rosa Declaration). In addition, Respondents do not dispute his allegation

6    that "ICE did not assess whether he presented a flight risk or danger to the community." Dkt. 1 at

7    ¶ 146. It is also undisputed that Petitioner did not receive prior written notice of the reasons for

8    his re-detention or a hearing. Dkt. 1 at ¶¶ 145, 147.

9    **C.    Petitioner Lopez Lopez was Released by ORR as Unaccompanied Child**

10    Finally, Petitioner Luis Lopez Lopez, a citizen of Guatemala, entered the United States

11    on or around October 31, 2021, at age seventeen. Dkt. 1 at ¶ 100; Dkt. 10 (Lopez Lopez

12    Declaration); Dkt. 30 (Reed Declaration). Petitioner Lopez Lopez was apprehended by USBP,

13    charged as inadmissible under Section 212(a)(6)(A)(i) of the INA, and briefly detained. Dkt. 1 at

14    ¶ 100; Dkt. 2-16 (Notice to Appear); Dkt. 10 (Lopez Lopez Declaration); Dkt. 30 (Reed

15    Declaration). Because he was classified as an unaccompanied child, Petitioner was released by

16    DHS to the custody of ORR so that he may be placed into the care of a sponsor. Dkt. 30 (Reed

17    Declaration). Ultimately, Petitioner was released to the care of his stepfather in Illinois. Dkt. 1 at

18    ¶¶ 100–02; Dkt. 2-17 (Unaccompanied Child Information); Dkt. 10 (Lopez Lopez Declaration);

19    Dkt. 30 (Reed Declaration). While released, Petitioner found employment, met his now wife, and

20    had his first child. Dkt. 1 at ¶¶ 102–03; Dkt. 10 (Lopez Lopez Declaration).

21    While driving to work, Petitioner Lopez Lopez was re-detained by ICE on December 30,

22    2025, and subsequently transferred to NWIPC. Dkt. 1 at ¶¶ 104–05; Dkt. 10 (Lopez Lopez

23    Declaration); Dkt. 30 (Reed Declaration). It is undisputed that Petitioner did not receive prior

24

notice and has not received a hearing regarding his re-detention. Dkt. 1 at ¶¶ 107–09; Dkt. 10 (Lopez Lopez Declaration); Dkt. 30 (Reed Declaration).

## II.    PROCEDURAL BACKGROUND

Petitioners filed the instant Petition pursuant to 28 U.S.C. § 2241 on January 30, 2026. Dkt. 1. On February 17, 2026, Respondents filed a Return arguing that Petitioners' re-detention comports with due process. Dkt. 19. On February 23, 2026, Petitioners filed a Traverse. Dkt. 34.

Petitioners allege that Respondents violated their procedural due process rights by re-detaining them without pre-deprivation notice and a hearing. Dkt. 1; Dkt. 34. Respondents disagree, claiming that Petitioners' re-detention was warranted and within Respondents' statutory authority. Dkt. 19.

Having reviewed the parties' arguments, the factual record, and the relevant legal authority, the Court concludes that Petitioners did not receive constitutionally adequate process and are entitled to some, but not all, of the relief requested in the Petition.

## III.    LEGAL STANDARDS

### A.    Habeas Petitions

Federal courts have authority to grant writs of habeas corpus to individuals in custody if such custody is a "violation of the Constitution or laws or treaties of the United States[.]" 28 U.S.C. § 2241(c)(3). "[T]he essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and... the traditional function of the writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973). To obtain habeas relief, habeas petitioners have the burden of demonstrating there is no lawful basis for their detention by a preponderance of the evidence. *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004); 28 U.S.C. § 2241(c).

1

**B.    Mandatory Detention Scheme**

2    8 U.S.C. § 1225 applies to "applicants for admission" to the United States, defined as a

3    noncitizen "present in the United States who has not been admitted or who arrives in the United

4    States[.]" 8 U.S.C. § 1225(a)(1). Applicants for admission face mandatory detention and may

5    only be released on parole "for urgent humanitarian reasons or significant public benefit," §

6    1182(d)(5)(A). *Jennings v. Rodriguez*, 583 U.S. 281, 287 (2018).

7    This sole exception to mandatory detention, often referred to as humanitarian parole, may

8    be granted "only on a case-by-case basis." 8 U.S.C. § 1182(d)(5)(A). The implementing

9    regulations include another requirement for humanitarian parole: the noncitizen must "present

10    neither a security risk nor a risk of absconding." 8 C.F.R. § 212.5(b). In other words, if a

11    noncitizen has been granted humanitarian parole, it means that a DHS official with authority[4]

12    decided that there were either "urgent humanitarian reasons" or "significant public benefit"

13    justifying the parole of that individual, and that the individual did not pose a security or flight

14    risk. *See* 8 U.S.C. § 1182(d)(5)(A); 8 C.F.R. § 212.5(b).

15    Humanitarian parole may be terminated in two ways; each with their own procedural

16    requirements. First, parole terminates automatically if the noncitizen departs from the United

17    States or "at the expiration of the time for which parole was authorized." 8 C.F.R. § 212.5(e)(1).

18    With automatic termination of parole, no written notice is required. *Id.* Second, if parole is not

19    terminated automatically, either "the purpose for which parole was authorized" must have been

20

21    ———————————————

22    [4] DHS officials authorized to make humanitarian parole decisions are "the Assistant Commissioner, Office of Field Operations; Director, Detention and Removal; directors of field operations; port directors; special agents in charge; deputy special agents in charge; associate special agents in charge; assistant special agents in charge; resident agents

23    in charge; field office directors; deputy field office directors; chief patrol agents; district directors for services; and those other officials as may be designated in writing, subject to the parole and detention authority of the Secretary or

24    his designees." 8 C.F.R. § 212.5(a).

accomplished or a DHS official with authority must decide that "neither humanitarian reasons nor public benefit warrants the continued presence of the [noncitizen] in the United States." 8 C.F.R. § 212.5(e)(2)(i); *see also* 8 U.S.C. § 1182(d)(5)(A) ("[W]hen the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the [noncitizen] shall forthwith return or be returned to the custody from which he was paroled[.]"). In such instances, the noncitizen must be provided written notice of the parole termination. 8 C.F.R. § 212.5(e)(2)(i).

Whether automatic or on notice, once a noncitizen's parole has been terminated, implementing regulations require that "any order of exclusion, deportation, or removal previously entered *shall be executed*." 8 C.F.R. § 212.5(e)(2)(i) (emphasis added); *see also* 8 C.F.R. § 212.5(e)(1). "If the exclusion, deportation, or removal order cannot be executed within a reasonable time, the [noncitizen] *shall again be released* on parole unless in the opinion of [a DHS official with authority] the public interest requires that the [noncitizen] be continued in custody." 8 C.F.R. § 212.5(e)(2)(i) (emphasis added). Stated differently, unless detention is required for the timely removal of a noncitizen, continued detention following release on parole must be supported by individualized assessment by an authorized DHS official. *Id.* Otherwise, implementing regulations require that a noncitizen be returned to humanitarian parole. *Id.*

Taken together, the applicable regulatory scheme requires that, where parole has automatically terminated upon expiration and the noncitizen is not returned to custody for either the timely execution of a removal order or upon an individualized decision by an authorized DHS official, continuation of humanitarian parole may be implied and, thereafter, the procedures for on-notice termination apply. *See, e.g.*, *Dieng v. Hermosillo*, No. 2:26-CV-00190-LK, 2026 WL 411857, at *6 (W.D. Wash. Feb. 13, 2026).

1  **C.     Due Process**

2          The Due Process Clause of the Fifth Amendment to the United States Constitution

3  prohibits the federal government from depriving any person "of life, liberty, or property, without

4  due process of law[.]" U.S. Const. amend. V. Due process protections extend to all individuals

5  within U.S. borders, including noncitizens, regardless of their immigration status. *Zadvydas v.*

6  *Davis*, 533 U.S. 678, 693 (2001).

7          Procedural due process demands meaningful notice and a genuine opportunity to be heard

8  before the federal government infringes upon a liberty interest. *Mathews v. Eldridge*, 424 U.S.

9  319, 332 (1976). Courts in the Ninth Circuit apply the *Mathews* balancing test in immigration

10 detention cases, weighing: (1) the private interest affected; (2) the risk of erroneous deprivation

11 under existing procedures and the value of additional safeguards; and (3) the government's

12 countervailing interest, including fiscal and administrative burdens. *Rodriguez Diaz v. Garland*,

13 53 F.4th 1189, 1206–07 (9th Cir. 2022); *see also E.A. T.-B. v. Wamsley*, 795 F. Supp. 3d 1316,

14 1321 n.4 (W.D. Wash. 2025) (collecting cases).

15                              **IV.     DISCUSSION**

16         Petitioners argue that, under the *Mathews* framework, their re-detention without prior

17 notice, individualized assessment, or the opportunity to be heard violated their procedural due

18 process rights under the Fifth Amendment to the United States Constitution. Dkt. 1; Dkt. 34.

19         Respondents, on the other hand, contend that Petitioners fall into three categories of

20 noncitizens, all of which are subject to mandatory detention under 8 U.S.C. § 1225(b):

21

22

23

24

ORDER GRANTING IN PART PETITION FOR
WRIT OF HABEAS CORPUS - 15

1    Petitioners released on humanitarian parole,[5] Petitioners released on ORECs,[6] and Petitioner

2    Lopez Lopez who was released into the United States as an unaccompanied minor by the ORR.

3    Dkt. 19. Respondents do not meaningfully engage with the *Mathews* framework as applied to

4    any Petitioner in this case.[7] Instead, Respondents' general due process argument proceeds as

5    follows: because detention is mandatory for all Petitioners, additional procedural safeguards

6    would not alter their detention outcomes, and no procedural due process violation occurred. *Id.*

7        Upon review of the parties' arguments and submissions, the Court concludes that

8    Respondents violated the procedural due process rights of all twelve Petitioners in this case. The

9    Court begins its discussion with those Petitioners not released on humanitarian parole, which

10   includes those Petitioners in the OREC Group and Petitioner Lopez Lopez.

11   **A.    Petitioners in the OREC Group and Petitioner Lopez Lopez**

12       Despite their initial position that all Petitioners are subject to mandatory detention,

13   Respondents effectively concede that Petitioners in the OREC Group are likely not subject to

14   mandatory detention. Specifically, Respondents acknowledge that the Court "would likely" find

15   that Petitioners released on ORECs fall outside Section 1225(b)'s mandatory detention scheme

16   and instead fall within the discretionary detention framework addressed in *Herrera Gomez v.*

17   *Wamsley,* No. 2:25-CV-02642-JNW, 2026 WL 279966 (W.D. Wash. Feb. 3, 2026). Dkt. 19 at 9.

18   And, while conceding that *Herrera Gomez* is likely to apply and to nullify their mandatory

19

20   [5] As outlined above in Sect. 1. B., Petitioners in the Parole Group: Petitioners Guardiola Molina, Mendez Molina, and Soliman.

21   [6] As outlined above in Sect. 1. A., Petitioners in the OREC Group include Petitioners Caisa Telenchana, Delgado-Pacheco, Diallo, Dorante-Freitez, Espina Espina, Lamus Franco, Mbareck, and Melean-Faneite.

22   [7] Where, as here, Respondents outline legal standards without a discernible effort to apply the law

23   to the specific facts of Petitioners' case, the Petition may be treated as "functionally unopposed." *See Roca v. Scott*, No. 2:25-cv-02551, 2026 WL 60412, at *3 (W.D. Wash. Jan. 8, 2026); *see also Y.M.M. v. Wamsley*, No. 2:25-cv-02075, 2025 WL 3101782, at *2 (W.D. Wash. Nov. 6, 2025) (noting the Government brief identifies the

24   standard without an argument section, thus "appear[ing] to concede that there is no justification" for re-detention).

detention argument, Respondents do not offer an alternative argument for why their re-detention of Petitioners in the OREC Group without notice or hearing complied with due process.

The Court agrees with Respondents that the reasoning in *Herrera Gomez* applies in this case and adopts its conclusions and reasoning outlined below. More specifically, the court in *Herrera Gomez* concluded that a noncitizen who was released on an OREC was not subject to mandatory detention under Section 1225 and that arguments to the contrary were not supported by the facts of the case, were legally flawed, and, even if correct, did not alter the outcome of the court's due process inquiry. *Herrera Gomez,* 2026 WL 279966, at *2.

First, the court concluded that Respondents' arguments were undermined by the facts because "[i]mmigration officials…determined that Herrera Gomez was subject to Section 1226(a)—*not* Section 1225(b)—when they released her on her own recognizance." *Id.* The *Herrera Gomez* court was neither the first nor the last to reach this conclusion when presented with similar facts. Because humanitarian parole is the only exception to Section 1225's mandatory detention scheme, courts within this District consistently find that noncitizens subject to other modes of release most naturally fall under the discretionary detention scheme in Section 1226(a). *See, e.g.*, *Del Valle Castillo v. Wamsley*, No. 2:25-CV-02054-TMC, 2025 WL 3524932, at *5–6 (W.D. Wash. Nov. 26, 2025) (collecting cases from "courts across the country"); *Balwan v. Bondi*, No. 2:26-cv-00248-LK, 2026 WL 497098, at *4–5 (W.D. Wash. Feb. 23, 2026); *see also Jennings*, 583 U.S. at 300 ("[The humanitarian parole] exception to detention implies that there are no other circumstances under which aliens detained under § 1225(b) may be released.").

Next, the court in *Herrera Gomez* found that Respondents' argument was legally flawed under binding Supreme Court and Ninth Circuit authority and other similar decisions from this District, stating:

The Supreme Court has drawn a clear distinction between Sections 1225 and 1226. Section 1225 "applies primarily to aliens seeking entry into the United States," while Section 1226 governs "the process of arresting and detaining" noncitizens "already in the country." *Jennings v. Rodriguez*, 583 U.S. 281, 287–88 (2018); *see also Ledesma Gonzalez v. Bostock et al.*, Case No. 2:25-cv-01404-JNW-GJL, 2025 WL 2841574, at *3 (W.D. Wash. Oct. 7, 2025) (quoting *Jennings*, 583 U.S. at 287–88). The Ninth Circuit has similarly described Section 1226 as "provid[ing] the general process for arresting and detaining" noncitizens "who are present in the United States and eligible for removal." *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1196 (9th Cir. 2022). "In sum, U.S. immigration law authorizes the Government to detain certain aliens seeking admission into the country under §§ 1225(b)(1) and (b)(2). It also authorizes the Government to detain certain aliens already in the country pending the outcome of removal proceedings under §§ 1226(a) and (c)." *Jennings*, 583 U.S. at 289; *cf. Al Otro Lado v. Wolf*, 952 F.3d 999, 1011–12 (9th Cir. 2020) ("'Arrival' in th[e] context [of Section 1225(b)] should not be considered ephemeral or instantaneous but...as a process. An alien apprehended at any stage of this process, whether attempting to enter, at the point of entry, or just having made entry, should be considered an 'arriving alien.'" (quotation omitted)).

This Court has previously rejected the Government's Section 1225(b) argument and does so again here. *See Ledesma Gonzalez*, 2025 WL 2841574, at *3–4 (adopting reasoning in *Rodriguez Vazquez v. Bostock*, No. 3:25-cv-05240-TMC, 2025 WL 2782499 (W.D. Wash. Sept. 30, 2025)). Herrera Gomez was arrested while residing in the United States under an OREC and with the Government's permission, long after she presented herself at the border seeking asylum. *Id.* at *3. The Government did not subject her to mandatory detention under Section 1225(b)(1) when she arrived at the border in 2023; instead, it released her to live in the United States, "pending the outcome of [her] removal proceedings" under Section 1226(a). *Jennings*, 583 U.S. at 289. Under these circumstances, Herrera Gomez's detention falls within Section 1226(a)'s discretionary detention scheme, not Section 1225(b)'s mandatory detention provisions. *See Ledesma Gonzalez*, 2025 WL 2841574, at *3.

*Herrera Gomez*, 2026 WL 279966, at *2 (internal docket citations omitted).

Finally, the court in *Herrera Gomez* noted that, even if Respondents' arguments were correct, their statutory authority to detain did not alter the court's conclusion that the manner in which re-detention occurred violated due process. *Id.* at *3 (citing *Torres v. Hermosillo et al.*, Case No. 2:25-cv-02687-LK, 2026 WL 145715, at *2, 7–8 (W.D. Wash. Jan. 20, 2026) (holding that noncitizen detained under Section 1225(b), released under Section 1182(d)(5)(A), and

ORDER GRANTING IN PART PETITION FOR
WRIT OF HABEAS CORPUS - 18

subsequently re-detained had due process right to notice and opportunity to be heard before revocation of release)).

Consistent with *Herrera Gomez* and other decisions in this District, the Court concludes that Petitioners released on ORECs are not subject to mandatory detention under 1225(b). Moreover, because (1) Petitioners in the OREC Group established liberty interests in the months and years they were permitted to live in the United States, (2) the absence of pre-deprivation procedures in their re-detentions created an unacceptably high risk of erroneous deprivations, and (3) the governmental interest in their re-detention without adequate process is minimal or non-existent, the Court further concludes that their re-detention violated due process under the *Mathews* framework.[8]

This reasoning applies with equal force to Petitioner Luis Lopez Lopez. Mr. Lopez was not released by DHS pursuant to humanitarian parole under 8 U.S.C. § 1182(d)(5), but rather was released to a sponsor as an unaccompanied minor by the ORR. As such, the Court concludes that Petitioner Lopez Lopez is not subject to mandatory detention and instead falls within Section 1226(a)'s discretionary detention framework.

Applying *Mathews*, Petitioner Lopez Lopez, too, established significant liberty interests in the years he was permitted to live in the United States. Following his release, Petitioner Lopez

---

[8] The application of the *Mathews* factors to the case at bar is consistent with a high volume of similar cases within the District. *See, e.g.*, *E.A. T.-B.*, 795 F. Supp. 3d at 1321–24; *Ramirez Tesara v. Wamsley*, 800 F. Supp. 3d 1130, 1136–37 (W.D. Wash. 2025); *Kumar v. Wamsley*, No. 2:25-cv-01772-JHC-BAT, 2025 WL 2677089, at *3–4 (W.D. Wash. Sept. 17, 2025); *Ledesma Gonzalez v. Bostock*, No. 2:25-cv-01404-JNW-GJL, 2025 WL 2841574, at *7–9 (W.D. Wash. Oct. 7, 2025); *P.T. v. Hermosillo*, No. 25-cv-2249-KKE, 2025 WL 3294988, at *2–4 (W.D. Wash. Nov. 26, 2025); *Francois v. Wamsley*, No. 25-cv-2122-RSM, 2025 WL 3496557, at *3–4 (W.D. Wash. Dec. 5, 2025); *Manuel v. Hermosillo*, No. C25-CV-2353-TL-MLP, 2025 WL 3690778, at *2 (W.D. Wash. Dec. 10, 2025), *report and recommendation adopted*, No. C25-2353-TL-MLP, 2025 WL 3697277 (W.D. Wash. Dec. 19, 2025); *A.C.J. v. Hermosillo*, No. 2:25-cv-02486-DGE, 2026 WL 73857, at *3–5 (W.D. Wash. Jan. 9, 2026); *Perez v. Hermosillo*, No. 25-cv-2542-RSM, 2026 WL 100735, at *6 (W.D. Wash. Jan. 14, 2026); *Yildirim v. Hermosillo*, No. 25-cv-2696-KKE, 2026 WL 111358, at *2–4 (W.D. Wash. Jan. 15, 2026); *G.S. v. Hermosillo*, No. 25-cv-2704-TSZ, 2026 WL 179962, at *3 (W.D. Wash. Jan. 22, 2026); *Shinwari v. Hermosillo*, No. 2:26-cv-00009-RAJ, 2026 WL 262605, at *3–4 (W.D. Wash. Jan. 30, 2026). Respondents offer no reason as to why the Court should depart from the application of *Mathews* in these decisions, and the Court perceives none.

1    Lopez found employment, met his now-wife, and had his first child. Dkt. 1 at ¶¶ 102–03; Dkt. 10

2    (Lopez Lopez Declaration). The absence of pre-deprivation procedures in his re-detention

3    created an unacceptably high risk of erroneous deprivations, and the government's interest in his

4    re-detention without adequate process is minimal or non-existent. Therefore, the Court finds

5    Respondents' re-detention of Petitioner Lopez Lopez was also in violation of due process.

6        Accordingly, the Court finds that, in failing to provide prior notice and the opportunity to

7    be heard, Respondents re-detained Petitioners Caisa Telenchana, Delgado-Pacheco, Diallo,

8    Dorante-Freitez, Espina Espina, Lamus Franco, Mbareck, Melean-Faneite, and Lopez Lopez in

9    violation of their procedural due process rights.

10   **B.    Petitioners in the Parole Group**

11       Turning next to Petitioners released on humanitarian parole, the Court assumes *arguendo*

12   that Petitioners in the Parole Group were subject to Section 1225's mandatory detention scheme

13   upon termination of their parole. However, this statutory authority to detain does not obviate

14   Respondents' obligation to comply with due process. *See P.T.*, 2025 WL 3294988, at *2 ("To the

15   extent that the Government's briefing suggests that Section 1225(b) should be the beginning and

16   end of the Court's inquiry, this position is emphatically rejected. In determining the lawfulness

17   of Petitioner's detention, the Court will focus not on the Government's claimed authority to

18   detain, but the process by which Petitioner was detained."); *see also Francois*, 2025 WL

19   3063251, at *3 ("Any argument that ICE acted within its [statutory] authority has no [e]ffect on a

20   claim contending that detention violates Constitutional Due Process."). Thus, a more detailed

21   discussion of the *Mathews* framework for Petitioners Guardiola Molina, Mendez Molina, and

22   Soliman is warranted.

23

24

ORDER GRANTING IN PART PETITION FOR
WRIT OF HABEAS CORPUS - 20

1    1. <u>Parole Group Petitioners Established Strong Liberty Interests While Paroled in the</u>

2 <u>United States</u>

3    On the first factor, the Court examines the private interest at stake. As the relevant

4 interest here, "[f]reedom from bodily restraint has always been at the core of the liberty protected

5 by the Due Process Clause from arbitrary governmental action." *Foucha v. Louisiana*, 504 U.S.

6 71, 80 (1992); *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004) (interests in not being detained are

7 "the most elemental of liberty interests"); *see also Zadvydas*, 533 U.S. at 696 (a non-citizen has a

8 liberty interest "strong enough" to challenge "indefinite and potentially permanent" immigration

9 detention). This remains the case even when an individual is subject to conditions of parole or

10 release. *Doe v. Becerra*, 787 F. Supp. 3d 1083, 1093 (E.D. Cal. Mar. 3, 2025) ("The Supreme

11 Court has repeatedly recognized that individuals who have been released from custody, even

12 where such release is conditional, have a liberty interest in their continued liberty.")

13 (citing, *e.g.*, *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972) (finding a parolee had an interest in

14 his continued liberty)). Where, as here, a noncitizen "has lived with relative freedom in the

15 United States for years, the Constitution does not countenance fictional erasure of her actual

16 presence in this country—or her concomitant due process rights." *Torres*, 2026 WL 145715, at

17 *5 (cleaned up).

18    Following their initial release from detention, Petitioners Guardiola Molina, Mendez

19 Molina, and Soliman acquired significant liberty interests entitled to the protections of the Due

20 Process Clause. In reasonable reliance on these liberty interests, Petitioners in the Parole Group

21 variously obtained work permits and employment, built connections within their communities,

22 and applied for asylum in the United States. Accordingly, the first *Mathews* factor weighs

23 strongly in favor of Petitioners Guardiola Molina, Mendez Molina, and Soliman.

24

2.     <u>The Risk of Erroneous Deprivation of Liberty is High</u>

With respect to the second *Mathews* factor, the record suggests that Respondents failed to comply with regulatory requirements for revoking humanitarian parole, which heightens the risk of erroneous deprivation. *Torres*, 2026 WL 145715, at *7 ("[T]he risk of erroneous deprivation is significant where the government fails to follow its own procedures for revocation of parole, thus depriving the noncitizen of process due prior to revocation.") (collecting cases).

As outlined in Section III. B. above, several procedural protections apply to humanitarian parole decisions. For example, unless automatically terminated by expiration or the noncitizen's departure from the United States, a noncitizen is entitled to written notice that their humanitarian parole is being revoked. 8 C.F.R. § 212.5(e)(1).

Here, Petitioners Guardiola Molina, Mendez Molina, and Soliman allege that they did not receive written notice prior to their re-detention following humanitarian parole. Dkt. 1 at ¶¶ 86, 134, 145. Respondents submit no evidence or allegation to the contrary. Rather, Respondents appear to contend that Petitioners in the Parole Group were re-detained pursuant to the automatic termination of their parole, for which no notice is required. *See* Dkt. 19 at 7–8; *see also* 8 C.F.R. § 212.5(e)(1). But none of the Petitioners in the Parole Group were detained on or near the expiration of their humanitarian parole. Those circumstances instead imply that their humanitarian parole was extended beyond the initial expiration date and, thereafter, written notice was required. *See, e.g.*, *Dieng*, 2026 WL 411857, at *6 (inferring the same where noncitizen was not re-detained until long after their humanitarian parole expired).

On this point, Respondents note that it is "unclear" when humanitarian parole was set to expire for Petitioners Guardiola Molina and Mendez Molina. Dkt. 19 at 7. This uncertainty alone undermines Respondents' contention that these Petitioners' parole was revoked automatically due to expiration. For Petitioner Soliman, Respondents state that his humanitarian parole was

only valid for one year beyond July 18, 2023. Dkt. 19 at 8. However, Petitioner Soliman was not re-detained until more than two years beyond that date, implying once again that his humanitarian parole was extended beyond its initial expiration and, as such, he was entitled to written notice before re-detention.

Additionally, for noncitizens entitled to notice, termination of humanitarian parole requires the "accomplishment of the purpose for which parole was authorized" or for an authorized DHS official to decide that "neither humanitarian reasons nor public benefit warrants the continued presence of the [noncitizen] in the United States." 8 C.F.R. § 212.5(e)(2)(i). Here, again, Petitioners' allegations suggest these procedures were not followed. In particular, Petitioners Guardiola Molina, Mendez Molina, and Soliman allege that no individualized assessment of their risk of flight or dangerousness occurred before their re-detention. Dkt. 1 at ¶¶ 87, 135, 146. Respondents rebut this allegation only with respect to Petitioner Guardiola Molina. *See* Dkt. 31 at 2 (Soraghan Declaration, stating "DHS and partner agencies have acquired information indicating that Petitioner may be a sicario—hitman—for the Jalisco New Generation Cartel ("CJNG"). Accordingly, the decision was made to take Petitioner into ICE custody due to the significant danger to the community that he poses."). Respondents otherwise submit no evidence demonstrating that the original purpose of the Petitioners' parole was accomplished or that a DHS official with authority determined their continued parole was no longer warranted for "humanitarian reasons" or for the "public benefit." 8 C.F.R. § 212.5(e)(2)(i).

As a final point, it is important to note that, by nature of their initial release on humanitarian parole, Guardiola Molina, Mendez Molina, and Soliman were found to not be flight risks or dangers to the community. While circumstances may have changed, Respondents' failure to follow their own regulations created an undue risk of erroneous deprivation. *See* 8 C.F.R. §

212.5(b); *Doe*, 787 F. Supp. 3d at 1094 ("[G]iven that Petitioner was previously found to not be a danger or risk of flight...the risk of erroneous deprivation remains high.").

In sum, for those released on humanitarian parole:

> [D]ue process at least requires that (1) the government justify the basis for re-detention, as prescribed by the statute and its implementing regulations, and (2) [the noncitizen] be given the opportunity to be heard with respect to the government's basis for re-detention under the applicable statutory and regulatory framework at a meaningful time and in a meaningful manner.

*Dieng*, 2026 WL 411857, at *8 (internal citations and quotations omitted). Those constitutional minimums were not afforded in this case.

Accordingly, the second *Mathews* factor favors Petitioners. *See, e.g.*, *Zavorin v. Wamsley*, No. 2:26-CV-00173-DGE, 2026 WL 309733, at *4 (W.D. Wash. Feb. 5, 2026) (finding second *Mathews* factor weighed "strongly" in noncitizen's favor where the government failed to show it provided written notice of parole revocation or that an authorized DHS official "determined that the purposes of the parole have been served or that subsequent changes justified…re-detention"); *Torres*, 2026 WL 145715, at *7 (similar); *Dieng*, 2026 WL 411857, at *8 (similar).

3.     <u>The Government's Interest in Re-Detention Without Process is Minimal</u>

Respondents assert no governmental interest in their briefing. Nevertheless, the Court acknowledges there are strong governmental interests in the efficient administration of immigration laws, including those regarding detention of noncitizens. In pursuing those interests, however, the government is required to follow its own regulations. *O.F.B. v. Maldonado*, No. 25-CV-6336 (HG), 2025 WL 3277677, at *7 (E.D.N.Y. Nov. 25, 2025) ("[T]he government's interest in efficient administration of the immigration laws at the border is not impermissibly burdened by affording the process laid out in 8 C.F.R. § 212.5 because it is required to follow its

own regulations." (cleaned up)). As explained with respect to the second *Mathews* factor, that did not occur in this case. Accordingly, the third *Mathews* factor also favors the Parole Group.

Because all three *Mathews* factors weigh in the Parole Group's favor, the Court finds that Respondents violated their procedural due process rights.

Based on the foregoing, the Court concludes that all twelve Petitioners in this case are unlawfully detained.

## V.      REMEDY

Having determined that all twelve Petitioners were subject to re-detention without the constitutionally required process, the Court now determines the appropriate remedy for their unlawful confinement. Petitioners request their immediate release from confinement at NWIPC and permanent injunctive relief prohibiting their re-detention without specific procedural protections. Dkt. 1 at 36–37. Respondents contend that Petitioners are not entitled to immediate release and argue further that Petitioners' requests for injunctive relief are speculative and thus not ripe for judicial review. Dkt. 19 at 11–12.

As discussed below, the Court concludes that an order of immediate release is an appropriate remedy for all but one Petitioner in this case and, instead, concludes that an order of conditional release is the appropriate remedy for Petitioner Guardiola Molina. Additionally, the Court grants, in part, Petitioners' request for injunctive relief but declines to impose a one-size-fits-all procedural framework for any future re-detention decision that all twelve Petitioners in this case may separately face.

## A.      Release from Detention

As noted, "the traditional function of the writ is to secure release from illegal custody." *Preiser*, 411 U.S. at 484. "In modern habeas practice, courts often 'employ a conditional order of release,' which orders the government to release the petitioner unless it 'takes some remedial

action' that corrects" the government's violation of the law. *Cardozo v. Bostock*, No. 2:25-CV-00871-TMC, 2025 WL 2592275, at *2 (W.D. Wash. Sept. 8, 2025) (quoting *Harvest v. Castro*, 531 F.3d 737, 741–42 (9th Cir. 2008)). After issuing a conditional writ, a district court retains jurisdiction to ensure compliance with the writ and may order unconditional release if the government fails to comply with the initial habeas order. *Rose v. Guyer*, 961 F.3d 1238, 1246 (9th Cir. 2020). Other courts in this District have ordered conditional release where, for example, the record showed that ICE officials performed some individualized assessment of flight risk, dangerousness, or noncompliance with release conditions before re-detaining a petitioner. *See, e.g.*, *Singh v. Noem*, No. 2:26-cv-00246-BAT, 2026 WL 592265, at *3 (W.D. Wash. Mar. 3, 2026) (ordering conditional release where "Respondents claim to have detained Petitioner due to several violations of the OREC and Petitioner fails to rebut that asserted justification"); *Balwan*, 2026 WL 497098, at *5 (similar).

Given the constitutional defects underlying their re-detention without any meaningful individualized review performed by Respondents, the Court concludes that an order of immediate release is the appropriate remedy for Petitioners Caisa Telenchana, Delgado-Pacheco, Diallo, Dorante-Freitez, Espina Espina, Lamus Franco, Lopez Lopez, Mbareck, Melean-Faneite, Mendez Molina, and Soliman.

With respect to Petitioner Guardiola Molina, however, the Court determines that an order of conditional release requiring the provision of a prompt post-deprivation bond hearing is sufficient to cure the due process violations incurred in his re-detention. Unlike the other Petitioners in this case and despite some inconsistency within Respondents' briefing, Respondents have submitted specific evidence demonstrating that, while Petitioner Guardiola Molina was not provided written notice of the termination of his humanitarian parole as required by 8 C.F.R. § 212.5(e)(2)(i) or an opportunity to be heard on the reasons for his re-detention as

required by due process, immigration officials may have performed an individualized assessment and determined that Petitioner Guardiola Molina's continued release posed a risk of danger to the community. *See* Dkt. 31 at 2 (Soraghan Declaration).

Therefore, before requiring his unconditional release from immigration detention, the Court provides Respondents with the opportunity to support Petitioner Guardiola Molina's continued detention at a prompt bond hearing held before an IJ. At that bond hearing, Respondents must provide clear and convincing evidence demonstrating that, if released, Petitioner Guardiola Molina would pose a risk of danger to the community. *See Balwan*, 2026 WL 497098, at *5 (noting that clear and convincing evidence standard was appropriate when fashioning a remedy, even if such a standard were not required "as a general matter" for all noncitizens re-detained following release); *Singh*, 2026 WL 592265, at *3 (noting circuit split on evidentiary standard for post-deprivation bond hearings and concluding it was "reasonable" to impose clear and convincing evidence standard to remedy due process violation).

Accordingly, Petitioners' request for immediate release from confinement is **GRANTED IN PART** as set forth in the conclusion below.

**B.      Injunctive Relief**

Habeas corpus relief is "at its core, an equitable remedy." *Schlup v. Delo*, 513 U.S. 298, 319 (1995). The equitable roots of habeas corpus are embodied by "the statutory command that the judge, after granting the writ and holding a hearing of appropriate scope, [shall] 'dispose of the matter as law and justice require.'" *Fay*, 372 U.S. at 492 (quoting 28 U.S.C. § 2243). A habeas court is thus authorized to "fashion appropriate relief other than immediate release," *Preiser v. Rodriguez*, 411 U.S. 475, 487 (1973), in order to ensure an effective remedy for unlawful detention. *Cf. Roman v. Wolf*, 977 F.3d 935, 942 (9th Cir. 2020) ("Once a [constitutional] right and a violation have been shown, the scope of a district court's equitable

1  powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable

2  remedies.").

3      These equitable principles authorize courts not only to remedy unlawful detention

4  through release, but also to craft forward-looking relief necessary to prevent recurrence of the

5  constitutional violation. Where a petitioner demonstrates a cognizable danger of repeated

6  unlawful detention, permanent injunctive relief falls within the breadth and flexibility inherent in

7  habeas equitable powers. *See Cummings v. Connell*, 316 F.3d 886, 897 (9th Cir. 2003) ("The

8  necessary determination [for granting a permanent injunction] is that there exists some

9  cognizable danger of recurrent violation, something more than the mere possibility which serves

10 to keep the case alive.") (quotations omitted).

11     In this case, Petitioners allege, and the record supports, a clear pattern of re-detention

12 without sufficient process by Respondents, demonstrating that Petitioners face a continuing

13 threat of similar harm throughout their removal proceedings. *See* Dkt. 1. As set forth above,

14 Respondents have re-detained Petitioners following their release into the community without

15 adequate notice, without affording a hearing or performing individualized assessments, and—in

16 some instances—without following federal regulations governing Respondents' own claimed

17 authority to detain. This pattern demonstrates a continuing risk of constitutional harm, the

18 recurrence of which is not speculative.

19     At the same time, the current record does not demonstrate that a specific procedural

20 framework will clearly govern all prospective re-detention decisions for every Petitioner in this

21 case. That is, given the differing procedural postures of each Petitioner's immigration

22 proceedings and the varying circumstances that may warrant their future re-detention,

23 determining what specific process will be owed to all twelve Petitioners, in all circumstances, is

24 not possible on the current record. Thus, at this juncture, the Court finds it sufficient to prohibit

ORDER GRANTING IN PART PETITION FOR
WRIT OF HABEAS CORPUS - 28

Respondents from re-detaining Petitioners without adequate notice and opportunity to be heard. The Court will not, however, craft a comprehensive procedural scheme governing all conceivable re-detention decisions the twelve Petitioners may variably face.

Accordingly, Petitioners' request for injunctive relief is **GRANTED IN PART** as set forth in the conclusion below.

## VI.    CONCLUSION

For the foregoing reasons, Petitioners' habeas Petition (Dkt. 1) is **GRANTED IN PART**, and the Court **ORDERS** the following:

(1)    Respondents **SHALL release** Petitioners Cristian Caisa Telenchana, Kelvin Delgado-Pacheco, Cherif Diallo, Keismer Dorante-Freitez, Jose Espina Espina, Isidro Lamus Franco, Luis Lopez Lopez, Moustapha Mbareck, Raquel Melean-Faneite, Victor Mendez Molina, and Fares Soliman from custody immediately under the conditions of their prior release;

(2)    Respondents **SHALL** file a declaration within **24 HOURS** of the issuance of this Order, confirming that the above-listed Petitioners have been released from custody and providing the date and time of their release;

(3)    Respondents **SHALL** provide Petitioner Jesus Guardiola Molina with a bond hearing before an immigration judge **within seven days of this Order** at which the government bears the burden of proof by clear and convincing evidence that Petitioner Guardiola Molina is a danger to the community;

(4)    If a bond hearing is not provided **within seven days** of the date of this Order, Respondents **SHALL release** Petitioner Guardiola Molina from ICE custody immediately on the terms of his most recent release;

(5)    Respondents **SHALL file** a declaration with the Court confirming that Petitioner Guardiola Molina received a bond hearing—and the results of that hearing—or otherwise confirming his release by **March 20, 2026**; and

//

//

//

(6)    Respondents **SHALL NOT re-detain** any Petitioner without adequate notice and an opportunity to be heard.

Finally, the Court will entertain any post-judgment motion for attorney's fees, as requested in the Petition.

Dated this 12th day of March, 2026.

Grady J. Leupold
United States Magistrate Judge

ORDER GRANTING IN PART PETITION FOR
WRIT OF HABEAS CORPUS - 30